# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4833-16T3
                A-4834-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

      Plaintiff-Respondent,

v.

N.W.S. and J.K.C.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARIANSHIP OF L.N.S. and T.J.C.,

      Minors.

_____

          Argued October 10, 2018 – Decided October 25, 2018

          Before Judges Hoffman, Suter and Firko.

          On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0153-14.

Ryan T. Clark, Designated Counsel, argued the cause for appellant N.W.S. (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Marc R. Ruby, Designated Counsel, argued the cause for appellant J.K.C. (Joseph E. Krakora, Public Defender, attorney; Marc R. Ruby, on the briefs).

Merav Lichtenstein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Merav Lichtenstein, on the brief).

Rachel E. Seidman, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Rachel E. Seidman, on the brief).

PER CURIAM

Defendant N.S. (Nancy), mother of daughters T.C. (Tanner) and L.S. (Linda), and defendant J.C. (Jeremy), father of Tanner, challenge the Family Part order terminating their parental rights. On appeal, defendants argue the Division of Child Protection and Permanency (the Division) failed to present sufficient evidence to satisfy the best interests test, N.J.S.A. 30:4C-15.1(a)(3), and that the trial judge erred when he denied Jeremy's request for a bonding evaluation between Tanner and her paternal grandmother. We affirm.

A-4833-16T3

We summarize those aspects of the record that are most pertinent to our decision. Nancy is the mother of four children: Tanner (born August 29, 2005); Serena (born August 31, 2008); Linda (born January 11, 2011); and Muhammed (born June 9, 2017). As noted, Jeremy is the biological father of Tanner. G.F. (Greg) is the biological father of Linda, but his parental rights were terminated in a separate proceeding. Greg, Serena, and Muhammed are not subjects of this appeal.

Nancy has a serious, persistent substance abuse problem, primarily involving phencyclidine (PCP) and alcohol. Since it first received the case in December 2011, the Division made extensive, albeit unsuccessful, efforts to help Nancy overcome her substance abuse issues and reunite her with her children.

The Division removed the children from Nancy's custody in October 2012 after she failed several drug tests. The Division placed Linda in a resource home and Tanner with her father. However, Jeremy lost custody of Tanner the following month after he tested positive for heroin. Tanner was placed with her sister in the resource home.

In February 2013, the Division removed the children from the resource home and placed them with an aunt. In September 2014, the children went to live with Jeremy's mother, C.C. (Carol). In December 2014, Jeremy executed an identified surrender of his parental rights to Tanner, on the condition that Carol adopt her. In February 2015, Nancy executed an identified surrender of her rights to Tanner and Linda, also conditioned on Carol adopting them.

In September 2015, police arrested Carol and charged her with hindering the arrest of her son (the police had charged her son with murder). Upon learning of the pending charge two months later, the Division advised Carol it could not finalize her adoption of Tanner and Linda until she resolved the charge. The Division allowed the children to remain with Carol, but began to explore other placement options for the girls should the need arise; however, before the charges were dismissed, Carol moved to Pennsylvania. Because the hindering charge remained pending, Carol could not receive a license to serve as a resource parent in Pennsylvania. As a result, in October 2016, the Division removed Tanner and Linda and placed them in a resource home.

The Division continued to try to assist Nancy and arranged for her to attend parenting classes and receive substance abuse treatment. Nancy began treatment at a rehabilitation facility but was discharged because she

A-4833-16T3

"participated minimally and did not stop smoking PCP." Also during this time, Jeremy was incarcerated. The earliest he may be released is 2021.

The Division eventually initiated termination proceedings and the matter advanced to trial in June 2017. Following trial, the trial judge found in favor of the Division and terminated the parental rights of both defendants.

The trial judge determined Nancy's persistent drug use caused harm to the children and her numerous failures to complete substance abuse treatment demonstrated the harm would continue. The judge further determined that Jeremy endangered the safety, health, and development of his daughter by leading a violent lifestyle, selling drugs, violating probation, and failing to recognize the importance of his legal problems. The judge also found the Division had considered several kinship placements for the girls, although none of the options investigated proved viable. Further, the Division made significant efforts to reunite the children with their parents. These efforts included visitation services, CADC evaluations, counseling, drug treatment, psychological evaluations, bonding evaluations, parenting skills classes, and more. Lastly, the judge determined that terminating the parents' rights would cause more good than harm because the children had been out of their parents' custody for more than five years, needed stability, and had a dedicated resource

parent who made efforts to ensure the children would remain close with their other siblings and families.

## II.

To justify terminating parental rights, the Division must produce clear and convincing evidence to satisfy the following four statutory prongs of the "best interests" test:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

These four prongs are neither discrete nor separate, but overlap "to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citation omitted); In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved are extremely fact sensitive and require particularized evidence that address[es] the specific circumstance in the given case." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 554 (2014) (citation omitted) (alteration in original). The Division must prove by clear and convincing evidence all four statutory prongs. Ibid. To meet this standard, such evidence must be "so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010) (quoting In re Seaman, 133 N.J. 67, 74 (1993)).

Our review of a trial court's decision in a guardianship case is limited. R.G., 217 N.J. at 552. "[T]he trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid. (citation omitted). We accord deference to factual findings of the family court given its "superior ability to gauge the credibility of the witnesses who testify before it

and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448.

We will not overturn a family court's findings unless they went "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552 (quoting Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

On appeal, Nancy argues the Division did not meet its burden for each prong of the best interests test. Jeremy argues the Division committed several procedural violations in removing the children from his mother's care and that the trial judge erred by not allowing a bonding evaluation between Tanner and Carol.

After reviewing the record, we find the trial judge's opinion evinced an adequate appreciation for current legal standards focusing on the importance of permanency in a child's life and the need for parents to timely resolve drug issues that keep them from caring for their children.

> In our view, parents dabbling with addictive substances must accept the mandate to eliminate all substance abuse. Such unabated behavior initiates the foster care placement of their children and causes continuing harm

by depriving their children of necessary stability and permanency…. [T]he delayed reunification, accompanied by the concomitant consequence of allowing the child's attachment to a resource caregiver continues the significant harm to the child….

[N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 240 (App. Div. 2010) (citations omitted)].

"We have made it clear that [c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012) (citation omitted) (alteration in original).

A parent's continuing failure to provide a safe and stable home for a child constitutes harm that can satisfy the first and second prongs of the best interests test. F.M., 211 N.J. at 449-52; In re Guardianship of DMH, 161 N.J. 365, 378-83 (1999); T.S., 417 N.J. Super. at 244-45. A drug-addicted parent causes harm when she leaves her child with a surrogate caretaker and lets the child live in limbo for years. Even a loving, well-intentioned parent causes harm by inflicting that psychological insecurity on her child. See K.H.O., 161 N.J. at 363 ("We recognize that the continuing inability of the mother to overcome her own addiction in order to care for her child constitutes endangerment of the child."). We acknowledge that making the judgment as to how long to give

9

a parent to achieve sobriety – calculating the odds that giving her one more chance to achieve success will yield a better or worse result for the child – must be made on a case by case basis and is best left to the expertise of Family Part judges. See F.M., 211 N.J. at 448-49.

This case does not involve a parent who engages in the occasional use of marijuana or an occasional overuse of alcohol. This case involves a parent who uses PCP, a highly dangerous drug. Nancy tested positive for PCP at least six times during her involvement with the Division. She failed to complete substance abuse treatment despite numerous opportunities and attempts to do so. Thus, in light of Nancy's continued and unabated use of PCP, we cannot find the trial judge's determination clearly erroneous.

The Division also made extensive efforts to keep the children with family. The Division placed Tanner with her birth father initially. The Division then placed Tanner and Linda with an aunt and later with Jeremy's mother. The Division considered other relatives, but they failed to complete paperwork or did not want to take both girls. Carol never completed the necessary steps to obtain a new license after the charges against her were dropped. The record does not reflect any other viable option for the Division except for Tanner and Linda to continue in their resource home.

Lastly, as to the fourth prong, if a parent exposes a child to harm, "has been unable to remediate the danger to the child, and … the child has bonded with foster parents who have provided a nurturing and safe home, in those circumstances termination of parental rights likely will not do more harm than good." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008). The Division offered expert testimony that the children had developed an "exceptionally high level bond" with the resource parent. Further, the Division's expert testified the foster parent could mitigate any harm that might arise from the termination of the biological parents' rights, partly because the foster parent would allow the children to continue relationships with their biological families.

In addition, Linda told the Division case worker she did not want to live with her mother. While she preferred to live with Carol, she would rather remain with her foster parent rather than returning to her mother. The record demonstrates removing the children from the foster parent would have caused the children more harm than good.

Jeremy argues the Division failed to properly notify Carol of her right to appeal the rescission of her license when she moved to Pennsylvania; however, Jeremy concedes the Division "verbally told [Carol] she could appeal" the decision. Further, the applicable regulation only requires written notice of the

11

right to appeal when "there is a difference of opinion between the resource family parent and the Division representative regarding the removal." N.J.A.C. 3A:17-2.6. The record does not show any dispute or objection from Carol.

Jeremy also argues the Division failed to notify the Family Part when removing the children from Carol's care. In non-emergency situations, the Division should notify the parties at least thirty days in advance. N.J.A.C. 3A:17-2.3. The Division must also notify the court and the law guardian. N.J.A.C. 3A:17-2.6. The record demonstrates the court knew of the removal. Further, Carol informed the Division of her plan to move to Pennsylvania on October 5, 2016. She completed her move by October 24, 2016. Therefore, it was impossible for the Division to give at least thirty days' notice.

Lastly, Jeremy argues the trial court improperly denied him the ability to "proffer expert evidence comparing the quality of [Tanner]'s bonding with the grandmother who raised her … and the resource parent who wishes to adopt her." Jeremy argues the issue "was not the comparison of [Tanner]'s bonds with [Jeremy himself]. But the bond between [Tanner] and [Carol] was crucial to weighing whether the termination was appropriate."

The trial judge rejected Jeremy's initial request for the comparative bonding evaluation on the basis of relevancy. This analysis was correct. The issue at trial

concerned the termination of parental rights – not the placement of the children. Any concerns over the placement of the children should have been addressed when placement occurred.

Even if a bonding evaluation had occurred, the court could not have placed the children with Carol. Because she moved to Pennsylvania, Carol needed a new license to serve as resource parent for the children. At the time of trial, she had not obtained one. We find no reason to alter the Family Part's judgment of guardianship terminating parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION